J-S29017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF: J.A.G., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.A., MOTHER | : | No. 444 WDA 2024 |

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s): 3 in Adoption 2024

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF: J.A.G., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.A.A., MOTHER | : | No. 445 WDA 2024 |

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s): 3A in Adoption 2024

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF: J.A.G., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.A.A., MOTHER | : | No. 446 WDA 2024 |

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s): No. 3B in Adoption 2024

IN THE MATTER OF THE ADOPTION : IN THE SUPERIOR COURT OF
OF: J.A.G., A MINOR : PENNSYLVANIA
:
:
:
:
:
:
:
:
APPEAL OF: A.A., MOTHER : No. 447 WDA 2024

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
3C In Adoption 2024

BEFORE: DUBOW, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.: **FILED: November 20, 2024**

Appellant, A.A. ("Mother") appeals from the decrees entered in the Erie County Court of Common Pleas, Orphans' Court, which granted the petitions of Erie County Office of Children and Youth ("OCY") for involuntary termination of Mother's parental rights to her minor children, Ju.A.G., Jo.A.G., Joz.A.G., and Ja.A.G. (collectively "Children").[1]  We affirm.

The Orphans' Court set forth the relevant facts and procedural history of this case as follows:

> On November 10, 2022, OCY requested emergency shelter care for [Children] as [Ja.A.G.] was born … with methamphetamine in his system.  [Mother] also tested positive for methamphetamines at the time [of] his birth. The other children were living in the unfinished basement of [Mother's] sister's home.  [Children] were placed in kinship care with a maternal relative.  OCY sought emergency shelter care as [Mother and Children's father, J.G. ("Father"), had] a history of unstable housing, drug abuse,

---

[1] Children were born in September 2018, November 2020, September 2021, and November 2022, respectively.

- 2 -

mental health issues, and domestic violence. [Children] were exhibiting special needs which the parents had not attended to.

… [Children] were adjudicated dependent … on December 1, 2022. … [Mother was] ordered to comply with the following treatment provisions:

   1. Refrain from use of drugs and alcohol and participate in random urinalyses through the Esper Treatment Center.

   2. Participate in an assessment for the Family Dependency Treatment Court and follow all recommendations.

   3. Participate in a mental health evaluation and follow all recommendations.

   4. Obtain and maintain safe and stable housing.

   5. Obtain and maintain gainful employment.

   6. Participate in a parent education program.

   7. Demonstrate an ability to provide for [Children]'s safety and well-being, attend [Children]'s medical appointments, and other needed assessments.

   8. Cooperate with the caseworker.

   9. Visit with [Children] … supervised at [OCY] and/or [in the] community twice per week [and] two phone calls per week…. All visits were contingent on whether [Mother's] urinalyses were negative for drugs.

A permanency review hearing was held February 13, 2023. [The court] determined that [Mother did not comply] with the court-ordered treatment [plan]. … The visitation provisions were changed. [Mother was] not to have visitation with [Children] until [she] submitted 30 days of clean urine screens or [participated in] 30 days of inpatient drug treatment. … [Following this order from the court, Mother] started [a drug treatment program at Cove Forge

- 3 -

Treatment Center] but [was] administratively discharged [prior to completing 30 days of the program]. ... Consequently, [Mother] … [did] not have visitation with [Children during this review period].

The next permanency review hearing was held [on] June 7, 2023. [Mother] demonstrated moderate compliance with the permanency treatment plan. … Consequently, the court ordered a concurrent goal of reunification and adoption. … The court [granted Mother] … supervised visits with [Children] at the agency and/or [in the] community at least twice per week and … two phone calls per week….

The next permanency review hearing was held [on] October 9, 2023. [Mother] demonstrated minimal compliance with the permanency treatment plan. … The court suspended [Ju.A.G.'s] visits with [Mother] due to ongoing, residual effects of trauma she experienced in [Mother's] care….

[Another] review hearing was held [on] December 13, 2023. [Mother] demonstrated minimal compliance with the permanency treatment plan. … By this time, [Children] had been in kinship placement for 13 months.…

OCY requested [to change the permanency goal] to adoption because of [Mother's] concerning behaviors during this review period. [Mother] was incarcerated several times due to probation violations. [Mother] tested positive for fentanyl and norfentanyl on September 29, 2023 when she was pregnant with her fifth child. [Mother] was discharged from Family Dependency Treatment Court due to positive urine screens, probation violations, failure to actively engage in treatment services, and dishonesty with service providers. [Mother] failed to attend appointments at Stairways Behavioral Health for mental health and domestic violence therapy.

\* \* \*

There [were] ongoing concerns [about] domestic violence. At the time of the December permanency review hearing, [Father] had pending criminal charges for simple assault and harassment from an incident which occurred with [Mother] in July of 2023. Police records indicate that

- 4 -

additional domestic violence incidents occurred on May 18, 2023, May 28, 2023, and June 2, 2023. [Mother] was advised to get a protection from abuse order and domestic violence counseling but she did not follow through.

\*     \*     \*

On the basis of these circumstances, the permanency goal was changed to adoption [on December 15, 2023]. [OCY] was ordered not to render any further services to the parents.

\*     \*     \*

[On January 4, 2024, OCY filed a petition to involuntarily terminate Mother's parental rights to Children. The court conducted a termination hearing on March 5, 2024. Attorney Catherine Allgeier, who served as Children's guardian *ad litem* ("GAL") and their legal counsel] indicated the legal interests and best interests of [Children] did not diverge. The court accepted her representation [that] there was no conflict of interest in her dual representation.

… OCY presented … a summary of [Mother's] urinalysis results. Between November 29, 2022 and December 11, 2023, [Mother] had 70 no-show appointments, 2 dilute samples, 23 positive samples for fentanyl, nor-fentanyl, methamphetamine, and/or amphetamine. At the time she was pregnant with her fifth child, [Mother] tested positive for nor-fentanyl seven times between June 20, 2023 and July 31, 2023[. She tested positive] again in August and September of 2023. Coincidentally, [Mother] had resumed her relationship with [Father] at some time in May/June of 2023. …

Numerous service providers testified to the special needs exhibited by [Children] and the various therapies needed to address [Children's] special needs.

Jacqueline Kudary was the speech language pathologist for [Jo.A.G.] and [Joz.A.G.] from January and May of 2023 until their discharge in November and December of 2023. [Ms.] Kudary worked with the kinship providers and the children's day care providers to address [Jo.A.G.'s] lack of any functional communication. He was using grunting and

gestures to communicate rather than words. At [the] time of placement, [Joz.A.G.] was using some single words to express herself. She would become frustrated with not being able to express [her] needs which led to tantrums. [Mother] was not involved with the children's speech therapy.

Amber Lyons was the service coordinator for Erie County Care Management. Her role was to develop an individualized family service plan for [Jo.A.G.], [Joz.A.G.], and [Ja.A.G.]. The kinship providers contacted [Ms.] Lyons with their concerns about the children and their apparent delays. … [Jo.A.G.] exhibited communication delays and a possible autism spectrum disorder. [Joz.A.G exhibited] physical developmental delays and communication delays. [Ja.A.G.] had problems with developing adequate suck, swallow, breath patterns when taking a bottle, and neonatal abstinence syndrome. [Ms.] Lyons monitored the various services the children were receiving and met with the therapists and kinship providers. [Ms.] Lyons did not have an opportunity to work with [Mother]. [Ms.] Lyons … scheduled an appointment to meet with [Mother] to discuss the service plan for [Children. However, w]hen [Ms.] Lyons attempted to contact [Mother] by phone, there was no answer. [Mother] never met with [Ms.] Lyons to discuss [Children's] needs and how she could be involved in their therapies.

Krista Stauffer was the occupational therapist for [Jo.A.G.] and [Ja.A.G.] from November of 2022 until November of 2023. [Jo.A.G.] was unable to use utensils or tools, had difficulty engaging with toys, difficulty playing appropriately and exhibited a flat affect. [Ja.A.G.] had difficulty coordinating motor skills and exhibited skills delays from drug exposure in utero. … He [needed to wear] a cranial remodeling helmet to correct torticollis. … [Ms.] Stauffer worked primarily with the kinship provider and day care providers who provided excellent care to the children. [Ms. Stauffer testified that she never worked with Mother for Children's care.]

Billy Jo Lombardo was the early intervention therapist for [Jo.A.G.] and [Joz.A.G.] beginning in June of 2023. [Ms.] Lombardo was involved to address the children's concerning

- 6 -

behavioral issues. [Jo.A.G.] struggled to interact with his peers, would hit his peers and siblings, exhibited a limited ability to play, and had limited verbal communication. [Ms.] Lombardo taught him sign language to more easily communicate. [Jo.A.G.] exhibited significant delays in cognitive development and communication. [Joz.A.G.] exhibited concerning behaviors. She would engage in temper tantrums when frustrated. She would bang her head on the floor, drop to the floor, and hold her breath. She would not seek comfort and support from known caregivers. [Ms.] Lombardo worked with the kinship and day care providers to address the children's behaviors. She did not work with [Mother] and had no opinion [on] whether [Mother] would have been able to learn the skills necessary to address [Children's] behaviors.

Lauren Dibacco was [Ju.A.G.'s] trauma counselor beginning in January of 2023. In therapy, [Ju.A.G.] was having trauma flashbacks in the form of nightmares and shared memories of inappropriate physical discipline, belittling, domestic discord, verbal aggression and violence. She would throw herself on the floor, scream, cry, and [throw tantrums]. She was unable to soothe herself without the support of the kinship providers. [Ju.A.G.] talked of seeing both [Mother] and [Father] arrested and being in jail. [Ju.A.G.] verbalized [that] she was happy in [the kinship placement] and feels safe in their home. She wants to stay with her aunt and uncle. She is worried she will have to be returned to her parents. [Ms.] DiBacco worked with the kinship providers in their home. [Mother] was not involved in [Ju.A.G.'s] trauma therapy. Visits [between] [Mother] and [Ju.A.G.] were not therapeutically recommended. …

… Brad Delenko, [Mother's] adult probation officer [testified that he] became [Mother's] probation officer … in June of 2023. The terms of her probation were to comply with the terms of dependency treatment court, abstain from illegal drugs and alcohol, obey all laws, and stay out of trouble. [Mother] tested positive for fentanyl on July 24, 2023. She was detained on August 2, 2023, and placed in the Erie County Prison. [Mother] was released on August 15, 2023 to inpatient care at Gage House. [Mr.] Delenko received reports [that Mother] violated [her] behavior contract and was discharged unsuccessfully on September 19, 2023.

[Mother] tested positive for fentanyl the same date. She was then incarcerated until October 12, 2023, when she was released to the Gaiser inpatient facility in Butler, Pennsylvania. An out-of-town rehabilitation facility was recommended so [that Mother] could focus on her recovery without interference from [Father]. On November 29, 2023, [Mother] was successfully discharged from the Gaiser inpatient facility to the step-down facility, Gaudenzia Community House, in Erie, Pennsylvania. It is a term of her probation that she and her baby remain at Gaudenzia Community House for inpatient rehabilitation. If she does not remain compliant with the program, she will most likely be detained by adult probation. … As of the date of the termination hearing, [Mother had] remained compliant.

Michelle DuShole was the dependency treatment court coordinator for parents with substance abuse problems involved in dependency proceedings. [Mother] attended orientation for eligibility on January 20, 2023. [Mother] was found eligible for dependency treatment to address her drug and alcohol and mental health issues in April 2023. Referrals to appropriate programs were made on [Mother's] behalf. [Mother] started the parenting program. [Mother] began drug and alcohol treatment and mental health treatment at Stairways Behavioral Health. However, she tested positive for fentanyl on May 23, 2023. Around this time, [Father] started showing up at [Mother's] home. [Mother] began missing urinalysis testing. The treatment team learned of a domestic incident between [Mother] and [Father] which resulted in [Father] incurring charges for simple assault, harassment, and possession of drug paraphernalia. [Mother] was advised to avoid contact with [Father]. She did not. [Mother's] urinalysis screens became problematic. She was detained at the Erie County Prison and was given the option to go to Gage House where she could receive mental health and drug and alcohol therapy. Gage House is an inpatient treatment facility. [Mother] was reluctant to go because she had acquired housing, but ultimately went to the Gage House program. [Mother] was administratively discharged due to her concerning behaviors, lack of investment in the program and her inability to avoid [Father]. [Mother] was also dismissed from the dependency treatment court program. …

- 8 -

Erynne Kubat, [an OCY] caseworker, … recounted the history of the dependency proceedings. … During the first review period, [Mother] had no visits [with Children]. During the second review period, [Mother did not have any] visits with [Children] as [she was] unable to complete a 30-day inpatient stay or submit 30 days of clean urinalyses tests. During the third review period, … [Mother] had a few supervised visits with the three younger children. Visits with [Ju.A.G.] had been suspended as not beneficial to the child. [In] the fourth review period, [Mother did not have] any visits with [Children]…in part, [because] she was inpatient at the Gaiser facility in Butler, Pennsylvania.

\* \* \*

[Ms.] Kubat testified [that Children] are bonded with the kinship providers. [Children] refer to them as "mom" and "dad." The kinship providers have diligently participated in [Children's] therapies. [Children] have demonstrated improvement in their overall development, behaviors, speech, and emotions due to the kinship providers' diligent care. [Ms.] Kubat does not feel [Children] have a strong emotional bond with [Mother] which would be negatively impacted by termination of parental rights. In fact, [Ms.] Kubat feels [Children] would be negatively impacted if they were removed from the kinship home. On cross-examination, [Ms.] Kubat indicated she was aware [Mother] gave birth to her fifth baby in January of 2024. The baby remains in her care at [Gaudenzia] Community House, a 24 hour … supervised environment. The caseworker was unaware if [Gaudenzia] Community House would be able to accommodate the four children who are the subject of this termination proceeding.

[Mother] testified on her own behalf.… [Mother] disputed [that] a urinalysis that was positive for drug use in May of 2023 was due to ingestion. Instead, [Mother] posited the urinalysis was positive [because] she was doing in-home health care. The patient [Mother] was caring for had a fentanyl patch. [Mother] offers that she may [have] inadvertently touched the patch without [a] glove resulting in a positive urinalysis.

[Mother] disputes [that] she was administratively

discharged from Gage House due to violations of her behavior contract. [Mother] acknowledges [that] she was administratively discharged but only because she failed to turn in a required final essay on time. [Mother] testified that if she had turned in the essay on time, she would have stayed with the program. However, [Ms.] Kubat … received a report from Gage House indicating [Mother] was administratively discharged for the following reasons: [Mother] would cross-talk during groups, say things under her breath[,] have little to no interactions during group sessions[, exhibit] addictive thinking, manipulation, and/or demonstrate codependency issues. [Mother] explained she was put on a behavior contract at Gage House [because] her counselor was not focusing on her recovery. Instead, the counselor focused on [Mother's] relationship with [Father]. She butted heads with the counselor over this issue and was put on a behavior contract because of her attitude.

As for the positive urinalysis on September 19, 2023, [Mother] denies [that] she produced a urine sample that date. … [Mother] acknowledged abusing methamphetamine but denied using fentanyl. [Mother] theorized the methamphetamine could have been contaminated with fentanyl resulting in positive urinalysis screens for fentanyl. [Mother] expressed concerns [that] the kinship provider and trauma therapists [coached Ju.A.G.] into disclosing [that Mother used] inappropriate physical discipline…. [Mother] denied [Ju.A.G.] was ever subjected to inappropriate physical discipline. [Mother further expressed her belief that Children] were not as developmentally delayed as portrayed. [Mother] felt the service providers were exaggerating the extent of [Children's] developmental delays.

[Mother] acknowledged abusing methamphetamine while she was with [Father]. Despite past assertions [that] she would sever her relationship with [Father, Mother] admitted [that] she always [returned] to him and relapse[d] into drug abuse. [Mother testified that] she has severed her relationship with [Father].

[Mother] testified to her continued participation in the programs offered at [Gaudenzia] Community House.

- 10 -

[Mother] has been compliant with the program requirements at [Gaudenzia] Community House. She has plans to acquire stable housing at the Mercy Center for Women.

(Orphans' Court Opinion, filed 4/29/24, at 2-7, 9-17) (internal citations omitted).

On March 7, 2024, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2] Mother timely filed notices of appeal and contemporaneous concise statements of errors complained of on appeal for Ju.A.G., Joz.A.G., and Ja.A.G. on April 4, 2024, and for Jo.A.G. on April 5, 2024. This Court consolidated Mother's appeals *sua sponte* on May 14, 2024.

On appeal, Mother raises the following issues for our review:

Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(1) of the Adoption Act, when insufficient evidence was presented to indicate that Mother had [evidenced] a settled purpose of relinquishing rights.

Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(2) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions and causes of incapacity, abuse, neglect, or refusal to parent the child could or would not be remedied.

Whether the trial court abused its [discretion] in finding grounds for termination of parental rights existed under Section 2511(a)(5) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions that

_____

[2] The court also terminated Father's parental rights to Children. Father was not present at the termination hearing and is not party to this appeal.

- 11 -

led to placement had not been remedied after six months of placement.

Whether the trial court abused its [discretion] in finding grounds for termination of parental rights existed under Section 2511(a)(8) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions that led to placement had not been remedied after twelve months of placement.

Whether the trial court abused its [discretion] in finding grounds for termination of parental rights existed under Section 2511(b) of the Adoption Act, when insufficient evidence was presented relative to the subject child's bond with Mother, nor [was objective] evidence concerning the child's best interests presented.

(Mother's Brief at 4-5).

In her issues combined, Mother argues that she took steps to address her substance abuse issues by participating in various treatment programs that were recommended for her, successfully completing the inpatient program at the Gaiser Center, and successfully transitioning to the Gaudenzia Community House. Mother asserts that her urinalysis results demonstrate that there were significant periods of time when Mother had negative results, including the period immediately preceding the termination hearing while she was at the Gaiser Center and the Gaudenzia Community House. Mother also contends that at least half of her no-show appointments could be accounted for by her time spent incarcerated and in inpatient treatment programs. Mother further claims that she secured housing which remained available to her through the time of the termination hearing. Additionally, Mother argues that the court erred in concluding that she was unable to care for Children's

special needs because Children's special needs were not identified until after they were adjudicated, and Mother has not been afforded any opportunity to work with or participate in Children's treatment. For these reasons, Mother avers that OCY did not present sufficient evidence to establish grounds to terminate her parental rights pursuant to Section 2511(a)(1), (2), (5), or (8).

Additionally, Mother asserts the initial lack of visitation with Children was because Mother failed to produce 30 days of clean urinalysis testing. Mother claims that when she was permitted visitation, there were no reported concerns about her parenting, and she was affectionate with Children. Mother argues that her lack of visitation with Ju.A.G. was because visits were not therapeutically recommended by Ju.A.G.'s therapist even though the therapist only met with Ju.A.G. remotely and failed to conduct an independent analysis into Ju.A.G.'s allegations that she was fearful of Mother. Mother further contends that the OCY caseworker's opinion that termination was in Children's best interests was merely premised on the fact that Children appeared to be comfortable in the kinship home. Mother concludes that the Orphans' Court abused its discretion in finding that termination of Mother's parental rights was warranted pursuant to Section 2511(a)(1), (2), (5), (8) and (b). We disagree.

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the

order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d

- 14 -

1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

OCY filed a petition for the involuntary termination of Mother's parental rights to Children on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*      \*      \*

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*      \*      \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of her…parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of OCY supplied over a realistic time. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of OCY's services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond."

*Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has recently clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.*

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be

considered unfit and have … her rights terminated." ***In re B.L.L.***, 787 A.2d

1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [herself] to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of her… ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with her… physical and emotional needs.

***In re B., N.M.***, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa.

718, 872 A.2d 1200 (2005) (internal citations omitted). "[A] parent's basic

constitutional right to the custody and rearing of …her child is converted, upon

the failure to fulfill …her parental duties, to the child's right to have proper

parenting and fulfillment of [the child's] potential in a permanent, healthy,

- 19 -

safe environment." ***Id.*** at 856.

Instantly, the record supports the court's decision to terminate Mother's parental rights to Child under Section 2511(a)(8). Children were removed from Mother's care in November of 2022 and adjudicated dependent on December 1, 2022. OCY filed its termination petition on January 4, 2024, at which point more than 12 months had elapsed from the date of removal. During this time, despite having access to resources and services, Mother failed remedy the conditions that led to Children's removal. Specifically, Mother failed to demonstrate that she could maintain sobriety for a meaningful length of time. Over the course of the dependency proceedings, Mother had 70 no-show appointments for urinalysis screenings, 2 dilute samples, 23 positive samples for fentanyl, nor-fentanyl, methamphetamine, and/or amphetamine. While she was pregnant with her fifth child, Mother tested positive for nor-fentanyl. Although Mother provided explanations for some of her missed urinalysis screenings and positive tests, there were significant periods where Mother tested positive or failed to appear without explanation.

Additionally, Mother was incarcerated during the dependency proceedings for probation violations, including positive urinalysis screenings. Although Mother participated in various treatment programs, Mother failed to successfully complete a treatment program until November 29, 2023, when she participated in the inpatient treatment program at the Gaiser Center as a condition of her probation. Mother was advised to avoid contact with Father

due to concerns about domestic abuse and Mother's tendency to relapse when he is in her life. Nevertheless, Mother continued to see Father while Children were adjudicated, which led to periods of relapse and conflicts with her treatment program. Mother also failed to demonstrate that she acquired housing that could accommodate Children. At the time of the termination hearing, Mother was residing in the Gaudenzia Community House with her infant child. However, there is no evidence of record demonstrating that Mother has access to housing that could accommodate four additional children. On this record, we cannot say the court abused its discretion in finding that the conditions that led to Children's placement continued to persist after 12 months from the date of removal. As such, we discern no error with the court's determination that termination of Mother's parental rights was proper under Section 2511(a)(8). **See** 23 Pa.C.S.A. § 2511(a)(8); **In re Adoption of M.E.P., supra**. Thus, we need not address the remaining Section 2511(a) subsections. **See In re Z.P., supra**.

The record also supports the court's determination that Children's bests interests are served by termination of Mother's parental rights. Children have spent a significant portion of their lives in kinship placement and Mother has had very few visits with Children during that time because of her inability to produce negative urinalysis, incarceration, and/or participation in inpatient treatment programs. Ms. Kubat testified that Children are in a pre-adoptive home where all their needs are being met. **See Interest of K.T., supra**. Ms.

- 21 -

Kubat opined that Children are not strongly bonded with Mother but are well bonded with their kinship parents and would be negatively impacted if they were removed from the kinship home. *Id*. She noted that Children refer to the kinship parents as "mom" and "dad" and they are happy and healthy in the kinship parents' care. Ms. Dibacco also testified that Ju.A.G. verbalized that she is happy and safe in the kinship home and that she is scared to return to Mother's care.

Further, Children are progressing well in the kinship parents' care. Multiple service providers testified that Children have various special needs that require particularized care. They all testified that they worked with the kinship parents to address Children's therapeutic needs and that Mother has not been involved in Children's care. Although Mother argues that she was not provided the opportunity to work with Children's providers, Mother failed to demonstrate that she took any actions or made any effort to be involved in Children's care. *See In re B., N.M., supra*. Additionally, Ms. Lyons, who coordinated Children's services, testified that she attempted to schedule a meeting with Mother, but Mother failed to answer the phone. Mother also testified at the termination hearing that she did not believe that Children were as developmentally delayed as determined by their service providers.

Additionally, Children's GAL and legal counsel informed the court that the three youngest children were too young to express a preference but Ju.A.G. has consistently maintained a preference to remain in her kinship

home. He further opined that termination of Mother's parental rights is in Children's best interests to promote permanency in the kinship home where all of Children's needs are being met. On this record, we agree with the court that termination of Mother's parental rights was proper under Section 2511(b). **See** 23 Pa.C.S.A. § 2511(b); **In re Z.P., supra**. As such, Mother is not entitled to relief on any of her issues on appeal, and we affirm the decrees terminating Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/20/2024